Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANAND ROY, derivatively on behalf of FASTLY, INC., <br><br> Plaintiff, <br><br> v. <br><br> TODD NIGHTINGALE, RONALD KISLING, AIDA ALVAREZ, ARTUR BERGMAN, RICHARD DANIELS, DAVID HORNIK, PAULA LOOP, CHARLES MEYERS, CHRISTOPHER PAISLEY, and VANESSA SMITH, <br><br> Defendants, <br><br> and <br><br> FASTLY, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

## INTRODUCTION

Plaintiff Anand Roy ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Fastly, Inc. ("Fastly" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Todd Nightingale ("Nightingale"), Ronald Kisling ("Kisling"), Aida Alvarez ("Alvarez"), Artur Bergman ("Bergman"), Richard Daniels ("Daniels"), David Hornik ("Hornik"), Paula Loop ("Loop"), Charles Meyers ("Meyers"), Christopher Paisley ("Paisley"), and Vanessa Smith ("Smith") (collectively, the "Individual Defendants," and together with Fastly, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Fastly, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Nightingale and Kisling for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fastly, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 15, 2024 through May 1, 2024, both dates inclusive (the "Relevant Period").

2.     Fastly is a Delaware corporation based in San Francisco, California which

operates and competes in the content delivery network ("CDN") market through offering a cloud platform that processes, serves, and secures customers' applications. The CDN market is made up of operators who compete to attract developers from media and e-commerce companies. Fastly supplies and delivers Infrastructure-as-a-Service ("IaaS") cloud capabilities to those developers, which enables those developers to build, transmit, and secure digital content experiences at pay-as-you-go rates.

3.      In 2023, the CDN market was significantly consolidated, whereby certain developers and media companies adopted a "Multi-CDN" framework by combining their CDN needs from a select few various providers into one large global network. The result of this consolidation trend reduced the number of CDN vendors within the market, which in turn allowed CDN vendors, including Fastly, to materially increase their revenue growth and market share for a period.

4.       On February 14, 2024, Fastly issued a press release (the "February 14th Press Release") that featured revenue guidance for the upcoming fiscal year ending on December 31, 2024 ("Fiscal Year 2024"). The February 14th Press Release forecasted revenue for Fiscal Year 2024 to be between $580 million and $590 million.

5.      The February 14th Press Release quoted Defendant Nightingale, Fastly's Chief Executive Officer ("CEO"), as touting that, "***This quarter demonstrated the progress we've made in operational and financial rigor*** resulting in strong gross margins and non-GAAP net income," and "***Our go-to-market, packaging and channel efforts through 2023 delivered an inflection in our customer acquisition as we closed out the year[.] . . . This positions us well for 2024***, driving our mission to make every user experience fast, safe, and engaging."[1]

6.      However, these statements, among others, were materially false and misleading, as, in reality, Fastly had overstated its revenue capabilities by relying, in part, too heavily on the unique consolidation trend that occurred in 2023. Indeed, the opposite

---

[1] All emphasis is added unless otherwise noted.

was true: Fastly faced a significant risk of the Company's market share diminishing.

7.     The truth emerged on May 1, 2024, when the Company issued a press release disclosing Fastly's financial results for the first quarter of Fiscal Year 2024 (the "May 1, 2024 Press Release"). The May 1, 2024 Press Release revealed disappointing guidance for the remainder of Fiscal Year 2024. Specifically, the May 1, 2024 Press Release revealed: (1) the Company's performance totaled only $133.52 million for the first quarter of Fiscal Year 2024, missing consensus estimates by $0.35 million; and (2) the Company lowered its Fiscal Year 2024 revenue projections from $580 to $590 million to $555 to $565 million.

8.     That same day, Fastly held an earnings call with investors and analysts to discuss the Company's updated revenue guidance (the "Q1 2024 Earnings Call"). During the Q1 2024 Earnings Call, Defendant Nightingale revealed, "[t]he biggest factor is a reduction of revenue from a small number of our largest customers. The first-quarter revenue from our top 10 customers dropped from 40% to 38%[.]" Further, Defendant Nightingale cautioned that the Company was experiencing "significant volatility" in the Multi-CDN market as there existed a significant strategy-run by a number of Fastly's top 10 customers.

9.     During the Q1 2024 Earnings Call, Fastly's Chief Financial Officer ("CFO") Defendant Ronald Kisling, revealed that the Company was experiencing "a challenging environment of revenue declines in our largest customers, overshadowing the impact of new customer acquisition and product pipeline." Further, Defendant Kisling revealed that Fastly would likely not benefit from the favorable market conditions of early 2023 that resulted from the CDN consolidation trend, in the upcoming Fiscal Year 2024 as the Company had predicted and experienced in the prior year, during the same period.

10.     The next day, on May 2, 2024, Bank of America ("BOA") downgraded Fastly's stock from a "Buy" rating to an "Underperform" rating, slashing the Company's target stock price more than half. from $18 per share to $8 per share. Underpinning this

decision, BOA stated that, "[d]ecelerating growth in Fastly's largest customers, share loss in delivery, and limited visibility in 2H cause us to question a rebound in 2024," and further, "[w]hile we continue to like Fastly's positioning in the edge compute market, we see it as a 2025 opportunity instead of a near-term growth driver."

11.    On this news, the price of the Company's stock fell 32.02%, or $4.14 per share, from a closing price of $12.93 per share on May 1, 2024 to close at $8.79 per share on May 2, 2024.

12.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) there was actually a significant deceleration in growth among Fastly's largest customers, making it improbable that the increased market share gained in 2023 via the consolidation trend would remain; (2) the deceleration would likely have a material negative impact on Fastly's revenue growth; (3) because of the foregoing, the Company's financial position and/or prospects were materially overstated; and (4) the Company's internal controls were inadequate. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

13.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, five of the Individual Defendants sold shares of Company common stock at inflated prices for combined total proceeds of approximately $1,429,339.

14.    Additionally, in breach of their fiduciary duties, the Individual Defendants, during the Relevant Period, caused the Company to fail to maintain adequate internal

controls.

15.    In light of the Individual Defendants' misconduct—which has subjected the Company, its CEO, and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

16.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Nightingale's, and Defendant Kisling's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims

made in the Securities Class Action based on violations of the Exchange Act.

19.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.    Venue is proper in this District because Fastly's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

22.    Plaintiff is a current shareholder of Fastly. Plaintiff has continuously held Fastly common stock at all relevant times.

### Nominal Defendant Fastly

23.    Fastly is a Delaware corporation with its headquarters at 475 Brannan Street, Suite 300, San Francisco, California 94107. Fastly's Class A common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FSLY."

### Defendant Nightingale

24.    Defendant Nightingale has served as the Company's CEO and as a Company director since September 2022. According to the Company's Schedule 14A filed with the SEC on April 24, 2024 (the "2024 Proxy Statement"), as of March 15, 2024, Defendant Nightingale beneficially owned 610,965 total shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on March 15, 2024 was $12.60, Defendant Nightingale owned approximately $7,698,159 worth of Fastly's common stock as of that date.

25.    For the fiscal year ending December 31, 2023 (the "2023 Fiscal Year"), Defendant Nightingale received $10,165,468 in compensation from the Company. This

included $600,000 in salary, $8,978,088 in stock awards, $586,200 in non-equity incentive plan compensation, and $1,180 in all other compensation.

26.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Nightingale made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 26, 2024 | 48,640 | $13.97 | $679,501 |

Thus, in total, before the fraud was exposed, he sold 48,640 shares of Company common stock on inside information, for which he received approximately $679,501 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

27.     The 2024 Proxy Statement stated the following about Defendant Nightingale:

**Todd Nightingale**
has served as our Chief Executive Officer and as a member of our Board of Directors since September 2022. Mr. Nightingale previously served as the Executive Vice President and General Manager of Enterprise Networking and Cloud at Cisco Systems, Inc. since March 2020. From June 2016 to March 2020, Mr. Nightingale served as the Senior Vice President and General Manager of Cisco Meraki. Prior to that he held various roles as a Vice President at Cisco Meraki. Mr. Nightingale holds a Bachelor of Science in electrical engineering and computer science from Massachusetts Institute of Technology as well as a Masters in engineering from Massachusetts Institute of Technology. We believe that Mr. Nightingale's deep industry experience, including product engineering and business leadership roles in networking and cybersecurity, qualifies him to serve as a member of our Board of Directors.

**<u>Defendant Kisling</u>**

28.     Defendant Kisling has served as the Company's CFO since August 2021. According to the Company's 2024 Proxy Statement, as of March 15, 2024, Defendant Kisling beneficially owned 215,254 shares of the Company's Class A common stock.

Given that the price per share of the Company's Class A common stock at the close of trading on March 15, 2024 was $12.60, Defendant Kisling owned approximately $2,712,200 worth of Fastly's Class A common stock as of that date.

29.   For the 2023 Fiscal Year, Defendant Kisling received $4,617,311 in compensation from the Company. This included $600,000 in salary, $4,016,131 in stock awards, and $1,180 in all other compensation.

30.   During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Kisling made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| February 26, 2024 | 14,939 | $13.93 | $208,100 |
| April 1, 2024 | 12,000 | $12.92 | $155,040 |
| April 16, 2024 | 7,486 | $13.00 | $97,318 |

Thus, in total, before the fraud was exposed, he sold 34,425 shares of Company common stock on inside information, for which he received approximately $460,458 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

31.   The 2024 Proxy Statement stated the following about Defendant Kisling:

**Ronald Kisling**

has served as our Chief Financial Officer since August 2021. From June 2018 to January 2021, Mr. Kisling served as Chief Financial Officer of Fitbit, Inc., a consumer electronics and fitness company, which was acquired by Google LLC in January 2021 and served as Chief Financial Officer, Fitbit Business Unit from January 2021 to August 2021. He joined Fitbit in September 2014 and served as Chief Accounting Officer until his appointment as Chief Financial Officer. Prior to that, Mr. Kisling held Chief Financial Officer positions at numerous other technology companies, including Nanometrics Incorporated (now Onto Innovation Inc.), an industrial manufacturing company, PGP Corporation, a data encryption and security software company, Portal Software Inc., a product-based billing and revenue

management software company, SPL WorldGroup, Inc., a revenue and operations management software company, and Saba Software, Inc., a talent management software company. He previously held a variety of finance and accounting positions at Symantec, a security software company, and at Coopers & Lybrand L.L.P., a public accounting firm. Mr. Kisling holds a B.A. in economics from Stanford University.

**Defendant Alvarez**

32.    Defendant Alvarez has served as a Company director since August 2019. She currently serves as a member of the Compensation Committee and as the Chairperson of the Nominating and Corporate Governance Committee. According to the Company's 2024 Proxy Statement, as of March 15, 2024, Defendant Alvarez beneficially owned 41,724 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on March 15, 2024 was $12.60, Defendant Alvarez owned approximately $525,722 worth of Fastly Class A common stock as of that date.

33.    For the 2023 Fiscal Year, Defendant Alvarez received $244,994 in compensation from the Company. This included $45,000 in fees earned or paid in cash and $199,994 in stock awards.

34.    The 2024 Proxy Statement stated the following about Defendant Alvarez:

**Aida Alvarez**

has served as a member of our Board of Directors since August 2019. Ms. Álvarez has led important financial and government agencies and served in the cabinet of U.S. President William J. Clinton as the Administrator of the U.S. Small Business Administration. Ms. Álvarez serves on the board of directors of HP Inc., a technology company, since June 2016, Stride, Inc., a for-profit education company, since April 2017, and Bill.com Holdings, Inc., a provider of automated, cloud-based software for financial operations, since April 2022. She has previously served on the board of directors of Wal-Mart Stores, Inc., a retail company, MUFG Americas Holdings Corporation, a banking corporation, Zoosk, an online dating company, PacifiCare Health Systems, Inc., and Oportun Financial Corporation, a financial services company. Ms. Álvarez was the founding Chair of the Latino Community Foundation, and currently serves as its Board Chair Emerita. Ms. Álvarez holds a B.A. from Harvard College. We believe that Ms. Álvarez is qualified

to serve as a member of our Board of Directors because of her extensive experience in the technology and finance industries and her service on public company boards.

**Defendant Bergman**

35.     Defendant Bergman has served as a Company director since March 2011. He also currently serves as the Chief Technology Officer, served as the former "Chief Architect" from February 2020 until April 2024, and served as the former Chairperson of the Board of Directors from February 2020 until April 2023. According to the Company's 2024 Proxy Statement, "Mr. Bergman's role and responsibilities remain the same following the title change" from Chief Architect to Chief Technology Officer. Further, according to the 2024 Proxy Statement, as of March 15, 2024, Defendant Bergman beneficially owned 7,764,314 shares of the Company's common stock, holding 5.7% of the total voting power of the Company. Given that the price per share of the Company's Class A common stock at the close of trading on March 15, 2024 was $12.60, Defendant Bergman owned approximately $97,830,356 worth of Fastly Class A common stock as of that date.

36.     For the 2023 Fiscal Year, Defendant Bergman received $12,389,343 in compensation from the Company. This included $500,000 in salary, $5,269,622 in stock awards, $6,619,695 in option awards, and $26 in all other compensation.

37.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Bergman made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 20, 2024 | 8,387 | $15.03 | $126,057 |
| February 21, 2024 | 200 | $15.00 | $3,000 |
| February 26, 2024 | 3,327 | $13.93 | $46,345 |

Thus, in total, before the fraud was exposed, he sold 11,914 shares of Company common stock on inside information, for which he received approximately $175,402 in proceeds. His insider sales, made with knowledge of material nonpublic information before the

material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

38.    The 2024 Proxy Statement stated the following about Defendant Bergman:

**Artur Bergman**

has served as our Chief Technology Officer since April 2024. He served as our Chief Architect from February 2020 to April 2024, as our Chief Executive Officer from Fastly's founding in March 2011 until February 2020, Chairperson of the Board of Directors from February 2020 to April 2023, and as a member of our Board of Directors since March 2011. From September 2007 to June 2011, Mr. Bergman served as Manager, Vice President, then Chief Technology Officer of Wikia, Inc., a global community knowledge-sharing platform. From November 2005 to March 2007, Mr. Bergman served as Engineering Manager for Six Apart Ltd., a social networking service. From the second half of 2003 to August 2005, Mr. Bergman served as Engineering Manager of Fotango, Ltd., a subsidiary of Canon Europe. We believe that Mr. Bergman is qualified to serve as a member of our Board of Directors because of his industry knowledge and his experience as our founder, his leadership experience and deep technical expertise, including with respect to protecting against, understanding, and responding to cybersecurity risks.

**Defendant Daniels**

39.    Defendant Daniels has served as a Company director since November 2021. He currently serves as a member of the Audit Committee. According to the Company's 2024 Proxy Statement, as of March 15, 2024, Defendant Daniels beneficially owned 31,558 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2024 was $12.60, Defendant Daniels owned approximately $397,631 worth of Fastly Class A common stock as of that date.

40.    For the 2023 Fiscal Year, Defendant Daniels received $239,994 in total compensation from the Company. This included $40,000 in fees earned or paid in cash and $199,994 in stock awards.

41.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Daniels made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 15, 2024 | 7,766 | $12.66 | $98,318 |

Thus, in total, before the fraud was exposed, he sold 7,766 shares of Company common stock on inside information, for which he received approximately $98,318 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

42.     The 2024 Proxy Statement stated the following about Defendant Daniels:

**Richard Daniels**
has served as a member of our Board of Directors since November 2021. Mr. Daniels retired from Kaiser Permanente, an integrated managed care consortium, in 2020, where he was most recently Executive Vice President & CIO. He serves on the Board of CSAA Insurance Group and is on the Board of the Parkland Center for Clinical Innovation. Mr. Daniels has served on the Board of SVB Financial Group since October 2020. He also served on the Board of Playworks from December 2015 to January 2023. Before Kaiser Permanente, Mr. Daniels held technology leadership roles at Capital One and JPMorgan. Mr. Daniels holds a B.A.Sc. in Business Administration and Management from Texas State University. We believe that Mr. Daniels is qualified to serve as a member of our Board of Directors because of his leadership experience in technology roles, service as a member of the board of directors for other companies, and deep knowledge of information security risks.

**<u>Defendant Hornik</u>**

43.     Defendant Hornik has served as a Company director since February 2013. He currently serves as a member of the Compensation Committee, as a member of the Nominating and Corporate Governance Committee, and as the Chairperson of the Board. According to the Company's 2024 Proxy Statement, as of March 15, 2024, Defendant

Hornik beneficially owned 205,488 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2024 was $12.60, Defendant Hornik owned approximately $2,589,149 worth of Fastly Class A common stock as of that date.

44.    For the 2023 Fiscal Year, Defendant Hornik received $263,346 in total compensation from the Company. This included $63,352 in fees earned or paid in cash and $199,994 in stock awards.

45.    The 2024 Proxy Statement stated the following about Defendant Hornik:

**Mr. Hornik**

has served as the Chairperson of our Board of Directors since April 2023, Lead Independent Director of our Board of Directors from February 2020 to April 2023, and as a member of our Board of Directors since February 2013. Mr. Hornik has been a partner at Lobby Capital and August Capital, venture capital funds, since 2021 and 2000, respectively. From January 2019 to March 2022, Mr. Hornik served as a member of the board of directors of Gitlab Inc., a DevSecOps platform delivered as a single application. From August 2004 to September 2017, Mr. Hornik served as a member of the board of directors of Splunk Inc., a software and data solutions company. Mr. Hornik has served as a member of the board of directors of Bill.com, a cloud-based software company that automates back-office financial operations, since May 2016. Prior to joining August Capital, Mr. Hornik was an intellectual property and corporate attorney at the law firms of Venture Law Group and Perkins Coie LLP, and a litigator at the law firm of Cravath, Swaine & Moore LLP. Mr. Hornik holds an A.B. from Stanford University, an M.Phil from Cambridge University and a J.D. from Harvard Law School. We believe that Mr. Hornik is qualified to serve as a member of our Board of Directors because of his extensive experience with technology companies in our industry, his service on public and private company boards, and the historical knowledge and continuity he brings to our Board of Directors.

**Defendant Loop**

46.    Defendant Loop has served as a Company director since July 2021. She also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of March

15, 2024, Defendant Loop beneficially owned 33,832 shares of the Company's common stock. Given that the price per share of the Company's Class A common stock at the close of trading on March 15, 2024 was $12.60, Defendant Loop owned approximately $426,283 worth of Fastly Class A common stock as of that date.

47.    For the 2023 Fiscal Year, Defendant Loop received $243,744 in total compensation from the Company. This included $43,750 in fees earned or paid in cash and $199,994 in stock awards.

48.    The 2024 Proxy Statement stated the following about Defendant Loop:

**Paula Loop**

has served as a member of our Board of Directors since July 2021. Ms. Loop previously served as an Assurance Partner at PricewaterhouseCoopers LLP, an international professional services accounting firm, where her career spanned over 30 years. At PwC she served on the Board of Partners as the Risk and Quality Committee chair and was the leader of PwC's Governance Insights Center. She was also previously the New York Metro Regional Assurance Leader leading one of PwC's largest Assurance practices. She has served as a director of APi Group, a construction equipment and services company, since March 2022 and Robinhood Markets, a financial services company, since June 2021. Ms. Loop holds a B.S. in Business Administration from the University of California at Berkeley. We believe that Ms. Loop is qualified to serve as a member of our Board of Directors because of her significant experience working with boards and audit committees across multiple markets and industry sectors on governance, accounting, sustainability, and SEC reporting matters.

**Defendant Meyers**

49.    Defendant Meyers has served as a Company director since July 2021. He currently serves as the Chairperson of the Compensation Committee. According to the Company's 2024 Proxy Statement, as of March 15, 2024, Defendant Meyers beneficially owned 33,832 shares of the Company's common stock. Given that the price per share of the Company's Class A common stock at the close of trading on March 15, 2024 was $12.60, Defendant Meyers owned approximately $426,283 worth of Fastly Class A common stock as of that date.

50.    For the 2023 Fiscal Year, Defendant Meyers received $242,892 in total compensation from the Company. This included $42,898 in fees earned or paid in cash and $199,994 in stock awards.

51.    The 2024 Proxy Statement stated the following about Defendant Meyers:

**Charles Meyers**

has served as a member of our Board of Directors since July 2021. Mr. Meyers is the President and Chief Executive Officer and a director of Equinix, Inc., the world's digital infrastructure company. He previously served as President, Strategy, Services & Innovation, as well as Chief Operating Officer, after joining Equinix in 2010 as President, Americas Region. Mr. Meyers also previously held senior operating roles at Level 3 Communications and Verisign and was a member of the pre-IPO executive team at Internet Security Systems. Mr. Meyers holds a B.S. in Chemical Engineering from the University of Colorado Boulder, an M.S. in Engineering Management from Northwestern University, and an M.B.A. in Marketing, Strategy from the Northwestern University Kellogg School of Management. We believe that Mr. Meyers' leadership experience in the technology industry and his deep knowledge of cybersecurity risks faced by leading telecommunications and information technology companies qualifies him to serve on our Board of Directors.

**Defendant Paisley**

52.    Defendant Paisley has served as a Company director since July 2018. He currently serves as a member of the Nominating and Corporate Governance Committee and as the Chairperson of the Audit Committee. According to the Company's 2024 Proxy Statement, as of March 15, 2024, Defendant Paisley beneficially owned 236,370 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2024 was $12.60, Defendant Paisley owned approximately $2,978,262 worth of Fastly Class A common stock as of that date.

53.    For the 2023 Fiscal Year, Defendant Paisley received $253,744 in total compensation from the Company. This included $53,750 in fees earned or paid in cash and $199,994 in stock awards.

54.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Paisley made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 20, 2024 | 1,000 | $15.60 | $15,600 |

Thus, in total, before the fraud was exposed, he sold 1,000 shares of Company common stock on inside information, for which he received approximately $15,600 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

55.    The 2024 Proxy Statement stated the following about Defendant Paisley:

**Christopher Paisley**
has served as a member of our Board of Directors since July 2018. Since January 2001, Mr. Paisley has served as the Dean's Executive Professor of Accounting at the Leavey School of Business at Santa Clara University. Mr. Paisley also serves as lead independent director of Equinix, Inc., a provider of network colocation, interconnection, and managed services, since July 2007, and a member of the board of directors of Ambarella, Inc., a developer of low-power, high-definition video compression and image processing semiconductors, since August 2012. Mr. Paisley previously served as a director of Fitbit, Inc. from January 2015 to May 2020, as a director of Fortinet, Inc., a cybersecurity software company, from 2004 until May 2021, and as Chief Financial Officer and a director of Enterprise 4.0 Technology Acquisition Corp., a special purpose acquisition corporation from May 2021 to March 2023. Mr. Paisley holds a B.A. in business economics from the University of California at Santa Barbara and an M.B.A. from the Anderson School at the University of California at Los Angeles. We believe that Mr. Paisley's substantial experience in the technology industry and his service on public company boards and audit committees qualifies him to serve on our Board of Directors.

**Defendant Smith**

56.    Defendant Smith has served as a Company director since November 2021. She currently serves as a member of the Nominating and Corporate Governance Committee. According to the Company's 2024 Proxy Statement, as of March 15, 2024, Defendant Smith beneficially owned 34,324 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2024 was $12.60, Defendant Smith owned approximately $432,482 worth of Fastly Class A common stock as of that date.

57.    For the 2023 Fiscal Year, Defendant Smith received $233,744 in total compensation from the Company. This included $33,750 in fees earned or paid in cash and $199,994 in stock awards.

58.    The 2024 Proxy Statement stated the following about Defendant Smith:

**Vanessa Smith**

has served as a member of our Board of Directors since November 2021. Since May 2023, Ms. Smith has served as President of ServiceNow.org, and from September 2020 to May 2023, Ms. Smith served as Senior Vice President of Industries at ServiceNow, Inc., a software company. From October 2004 to August 2020, Ms. Smith served in a variety of go-to-market roles, most recently Regional Vice President, Strategic Customers and Senior Vice President, Human Capital Management LOB, for SAP, a software company. She holds a B.S. in Commerce from The McIntire School of Commerce at the University of Virginia and an M.B.A. from The Robert H. Smith School of Business at the University of Maryland. We believe that Ms. Smith's leadership experience in technology and go-to-market roles and her experience in human capital management qualifies her to serve on our Board of Directors.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

59.    By reason of their positions as officers, directors, and/or fiduciaries of Fastly and because of their ability to control the business and corporate affairs of Fastly, the Individual Defendants owed Fastly and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Fastly in a fair, just, honest, and equitable manner. The Individual

Defendants were and are required to act in furtherance of the best interests of Fastly and its shareholders so as to benefit all shareholders equally.

60.    Each director and officer of the Company owes to Fastly and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

61.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Fastly, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

62.    To discharge their duties, the officers, and directors of Fastly were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

63.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Fastly, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

64.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the

dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's Class A common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

65.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Fastly were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Fastly's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Fastly conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Fastly and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent

investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Fastly's operations would comply with all applicable laws and Fastly's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

66.    Each of the Individual Defendants further owed to Fastly and the shareholders the duty of loyalty requiring that each favor Fastly's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

67.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Fastly and were at all times acting within the course and scope of such agency.

68.    Because of their advisory, executive, managerial, directorial, and controlling positions with Fastly, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

69.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Fastly.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

70.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

71.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

72.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Fastly was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

73.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct

part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

74.    At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Fastly and was at all times acting within the course and scope of such agency.

## FASTLY'S CODE OF ETHICS AND CORPORATE GOVERNANCE

### *Fastly's Code of Business and Ethics*

75.    Fastly's Code of Business and Ethics (the "Code of Conduct") applies to "anyone who works for Fastly, or with Fastly…. [t]his includes employees, contractors, consultants, partners, suppliers, agents, volunteers, and representatives."

76.    The Code of Conduct states its general purpose under the heading "An Introduction to Our Business and Our Value," in relevant part:

> Our vision to create a trustworthy internet where good thrives guides everything we do. At our core, Fastly is curious, trustworthy, and transparent. We're competitive and act with passion. We always focus on our customers and operate with integrity. Simply said, we're just good people. These values are core to the culture of the company, the decisions we make, and the way we operate.

> Actions speak louder than words. While our business represents what we do and our values represent who we are, the following Code of Business Conduct and Ethics outlines how we behave.

77.    Under the heading "the Original Fastly Code of Conduct," the Code of Conduct states simply that, "We comply with all applicable laws and regulations."

78.    In the section titled "Be fair, honest, and ethical – always," the Code of Conduct further states, in relevant part:

> ***This ethos extends across the board.*** Whether you're dealing with colleagues, customers, suppliers, partners or competitors, it's important to always be fair, honest, and ethical. ***This means no deception, misrepresentation, plagiarism, or manipulation of facts — from making false product and service***

***statements to filing misleading financial documents.***"[2]

79.    In a section titled "Taking Care of Fastly's Property," the Code of Conduct makes it clear, in relevant part:

**All Fastly money should have a paper trail**
Fastly's books and records should accurately reflect our transactions and expenses. Our accounting system must detail all financial transactions and internal accounting to protect from unauthorized payments. And our employees are required to be accurate and timely when submitting expense reports, purchase orders, and invoices. All public companies are required to comply with these accounting standards.

80.    Also, under the same section titled "Taking Care of Fastly's Property," the Code of Conduct addresses public financial reporting and communication responsibilities, by stating, in relevant part:

**Disclosing financial Statements**
Our trusted Senior Financial Officers are responsible for making sure our periodic reports and other public communications are accurate, understandable, and delivered on time.

**Corporate Disclosure Policy—Principles**

1. The initial disclosure of material information by Fastly will generally be made only through press releases, SEC filings, or other means reasonably designed to provide broad, non-exclusionary distribution of the information to the public so that all members of the investing public will have an equal opportunity to simultaneously access the material information.
2. Rumors concerning the business and affairs of Fastly may circulate from time to time, and our general policy is not to comment on such rumors.
3. We will not confirm or update material information about us that has been previously disclosed to the public, except in a manner consistent with the procedures outlined in this policy.

81.    Fastly addresses "Insider Trading," within the Code of Conduct in detail stating, *inter alia*:

The bottom line on insider trading is that if you are aware of material nonpublic information about Fastly or another publicly traded company that

---

[2] Unless otherwise noted, all emphasis in bold and italics herein after is added.

Fastly has business relationships with and you trade in Fastly's or such other company's securities, you have broken the law. It does not matter whether the decision to buy or sell was influenced by the material nonpublic information, how many shares you buy or sell, or whether it has an effect on the stock price.

Regardless of who you are, if you know something material about the value of a security that not everyone knows and you trade (or convince someone else to trade) in that security, you may be found guilty of insider trading. If you are uncertain of whether information might be "material" or "nonpublic" do not hesitate to reach out to The Office of the General Counsel

### Insider Trading Policy—Principles

1. Fastly personnel are responsible for understanding the obligations that come with having access to material nonpublic information and wanting to transact in Fastly securities.
2. Fastly personnel who are aware of material nonpublic information relating to Fastly may not engage in transactions in Fastly's securities except as permitted by this policy and applicable law.
3. Fastly personnel who are aware of material nonpublic information relating to Fastly may not recommend the purchase or sale of any Fastly's securities.
4. Fastly personnel may not disclose material nonpublic information to persons within Fastly whose jobs do not require them to have that information.
5. Fastly personnel may not disclose material nonpublic information outside of Fastly unless the disclosure is made in accordance with a specific Fastly policy that authorizes such disclosure.
6. Unless authorized by a Fastly policy and as required by their role at the company, Fastly personnel may not assist anyone engaged in transactions in Fastly securities, the recommendation to buy or sell Fastly securities, or the disclosure of material nonpublic information.

82.    The Code of Conduct addresses "Conflicts of Interest" stating, in relevant part:

As a Fastly employee, your loyalty should remain to the company. Conflicts of interest wedge themselves between your personal interests and your performance at the company. It only takes one person outside of Fastly to perceive a potential conflict, which could harm our reputation.

*          *          *

It's your responsibility to report anything that might be perceived as a conflict

of interest to our Office of the General Counsel (or if you're an executive, to the Board of Directors).

83.    While the Code of Conduct does allow directors and executives to waive provisions of the Code of Conduct, they may only do so with the written permission of the Board. The Code of Conduct emphasizes that any "[n]on-substantive changes may be approved by Fastly's General Counsel or other member of the Fastly Law team as may be designated by the CEO from time to time. If approved, this modification will be disclosed to stockholders as required by the rules of any stock exchange."

### *Fastly's Corporate Governance Guidelines*

84.    The Company also maintains "Corporate Governance Guidelines" (the "Governance Guidelines"). Under the section titled "Director Responsibilities," the Governance Guidelines state:

> Stockholders select directors to provide oversight and strategic guidance to senior management. A director's responsibility is to fulfill his or her fiduciary duties of care and loyalty, and otherwise to exercise his or her business judgment in the best interests of the Company and its stockholders. Board service requires significant time and attention. More specifically, *the Board has responsibilities to review, approve, and monitor fundamental financial and business strategies, assess our major risks, and consider ways to address those risks, select and oversee management, and establish and oversee processes to maintain our integrity*. To fulfill their duties, directors must prepare for meetings and discussions with management, participate in Board meetings, review relevant materials, and serve on committees. The Company expects directors to maintain an attitude of constructive involvement and oversight, ask relevant and incisive questions, and demand honest and accurate answers. Directors must act with integrity and demonstrate a commitment to the Company, our values, business, and long-term stockholder value.

85.    The Governance Guidelines specifically addresses director responsibilities under the heading "Board Responsibilities," stating, in relevant part:

> Board members will comply with the laws and requirements of the Exchange and other applicable regulatory agencies and with all policies and guidelines of the Company, including without limitation, the Company's Code of

Business Conduct.

Each director is expected to disclose promptly to the Board . . . any existing or proposed relationships with the Company, including compensation and stock ownership, which could affect the independence of the director. Each director will also promptly inform the Board of any material change in such information, to the extent not already known by the Board

\*                    \*                    \*

***Directors may not use such confidential information for personal benefit*** or to benefit other persons or entities other than the Company.

86.     In violation of the Code of Conduct and the Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, five of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting proceeds of approximately $1,429,139. Also, in violation of the Governance Guidelines, the Defendants failed to maintain the accuracy of Fastly's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

### Fastly's Audit Committee Charter

87.     Fastly also maintains a Charter of the Audit Committee (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities and states that the purpose of the Audit Committee is to:

- help the Board oversee the Company's corporate accounting and financial reporting processes, systems of internal control, and financial-statement audits and the integrity of the Company's financial statements.

- manage the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms

engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services[.]

- review any reports or disclosures required by applicable rules and regulations of the Securities and Exchange Commission (the "SEC") and the stock exchange that lists the Company's stock.
- oversee the organization and performance of the Company's internal audit function.
- help the Board oversee the Company's legal and regulatory compliance, including risk assessment; and
- provide regular reports and information to the Board with respect to material issues.

88.    The Audit Committee Charter states under the heading "Quarterly Reviews and Annual Audit Results," regarding financial statements and financial reporting, that "[t]he Committee will review with management and the Auditors the results of the quarterly financial reviews and annual audit as well as other significant issues regarding accounting principles and financial-statement presentation[.]" Specifically, the duties and responsibilities of the Audit Committee are as follows:

- the Auditors' assessment of the quality of the Company's accounting principles and practices;
- the Auditors' views about qualitative aspects of the Company's critical accounting policies and significant accounting practices, the reasonableness of significant judgments, and estimates (including material changes in estimates and analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements), and any other significant reporting issues and judgments, significant regulatory, legal, and accounting initiatives, or developments that may have a material impact on the Company's financial statements, compliance programs, and policies;
- all known and likely misstatements identified during the reviews and audit (other than those the Auditors believe to be trivial);
- the adequacy of the disclosures in the financial statements;
- any accounting adjustments that were noted or proposed by the Auditors but were "passed" (as immaterial or otherwise);

- the potential impact of the Company's financial statements of alternative treatments and any off-balance sheet structures;

- the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures, and reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies; and

- any other matters that the Auditors must communicate to the Committee under applicable accounting or auditing standards.

The Committee will review the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. ***The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K***.

89.    Regarding earnings announcements, the Audit Committee Charter states: "The Committee will review and discuss with management and the Auditors any earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies. The Chairperson of the Committee may represent the entire Committee for the purposes of this discussion."

90.    The Audit Committee Charter states that, regarding risk management and compliance, the duties and responsibilities of the Audit Committee are as follows:

**Risk Assessment and Management**. The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's financial reporting. The Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to information security, competition, and regulation. Areas of focus for the Committee shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks. The Committee will provide periodic reports to the Board about material issues affecting the quality or integrity of the Company's

financial statements, compliance with legal or regulatory requirements, the performance or independence of the Auditors, the performance of the Company's internal audit function and other matters as the Committee deems appropriate.

91.    The Audit Committee Charter also requires the Audit Committee to "review management's identification of any failures to comply with the Company's programs and policies, including violations of the Company's Code of Business Conduct and Ethics and applicable laws and regulations."

92.    In addition, Fastly's Audit Committee Charter requires that the Audit Committee "annually evaluate its performance and the adequacy of this Charter."

93.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

94.    Fastly is a Delaware corporation located in San Francisco, California. Fastly operates and competes in the CDN market, which is made up of operates who compete to attract business from developers working for media and e-commerce companies. Fastly supplies and delivers IaaS cloud capabilities to developers, which enables those developers to build, transmit, and secure digital content experiences at faster levels on a pay-as-you-go rate.

**False and Misleading Statements**

*February 14, 2024 Press Release*

95.    Following market close on February 14, 2024, the Company issued the February 14th Press Release announcing the fourth quarter and year-end financial results for 2023 for the Company.

96.    The February 14th Press Release discussed an air of positivity in the Company's business, estimating Fiscal Year 2024 revenue guidance in the range of $580 to $590 million. The February 14th Press Release quoted Defendant Nightingale as stating, in relevant part:

> This quarter demonstrated the progress we've made in operational and financial rigor resulting in strong gross margins and non-GAAP net income, … [o]ur go-to-market, packaging and channel efforts through 2023 delivered an inflection in our customer acquisition as we closed out the year, …. [t]his positions us well for 2024, driving our mission to make every user experience fast, safe, and engaging.

*February 14, 2024 Earnings Call*

97.    The same day as the February 14th Press Release, Fastly hosted an earnings call with analysts and investors detailing the Company's fourth quarter and 2023 Fiscal Year earnings results (the "February 14th Earnings Call"). Defendant Nightingale stated in a scripted statement, the following, in relevant part:

> I'm pleased to report that we closed out 2023 with revenue of $506 million, representing 17% year-over-year growth and coming in above the original $495 million to $505 million range we guided to one year ago. We reported record fourth quarter revenue of $137.8 million, which grew 15% year-over-year and 8% quarter-over-quarter. This result came in at the lower end of our fourth quarter guidance range, driven by weaker than anticipated international traffic, offset by seasonally strong live streaming and gaming activity.
>
> *            *            *
>
> Our customer retention efforts were stable in the fourth quarter with our LTM NRR at 113%, down slightly from Q3's 114%. Our total customer count in the fourth quarter was 3,243, which increased by 141 customers compared to

Q3 and increased by 181 customers year-over-year. Enterprise customers totaled 578 in the quarter, an increase of 31 from Q3, representing the highest level of sequential growth since we acquired Signal Sciences back in 2020. Our new packaging channel program and a renewed demand gen focus are driving a change in the velocity of customer acquisition at Fastly, and this is finally starting to show up in these disclosed customer accounts.

***As these customers grow with Fastly, they will fuel our revenue growth for years to come. This customer growth is also diversifying our revenue among verticals, which helps us optimize traffic across our fleet, yielding higher profitability.***

Our sales team has been energized by our recent success with large customer wins. Of the 31 new enterprise customers this quarter, 19 were net new to Fastly.

98.    Additionally, during the February 14th Earnings Call, Defendant Kisling stated in a scripted statement, the following in relevant part:

***For calendar year 2024, we expect revenue in the range of $580 million to $590 million***, an annual growth rate of 16% at the midpoint. This guidance reflects our expectation for quarter-on-quarter acceleration in revenue growth through the year, ***driven by new customer acquisition and continued expansion of existing customers***.

We expect to continue to see gross margin improvement in 2024 and to continue our spending discipline while increasing our investment in go-to-market and product development. We anticipate our 2024 gross margins will improve by approximately 200 basis points, plus or minus 100 basis points relative to 2023, and to exit the year with gross margins at 60% or better

***February 22, 2024 2023 10-K***

99.    On February 22, 2024, the Company filed its annual report on Form 10-K for the 2023 Fiscal Year with the SEC (the "2023 10-K"). The 2023 10-K was signed by Defendants Nightingale, Kisling, Alvarez, Bergman, Daniels, Hornik, Loop, Meyers, Paisley, and Smith. Additionally, it contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Nightingale and Kisling attesting to its accuracy.

100.    When explaining an overview of the Company's performance in the 2023

Fiscal Year, the 2023 10-K stated:

> Developers on the Fastly platform have a high degree of flexibility with granular control and real-time visibility, where they can write and deploy code in a serverless environment and push application logic to the edge. Our infrastructure is built for the software-defined future. Our network is powerful, efficient, and flexible, designed to enable us to rapidly scale to meet the needs of the most demanding customers. Our approach to scalable, secure reliability integrates security into multiple layers of development: architecture, engineering, and operations. That's why we invest in building security into the fabric of our platform, alongside performance. We provide developers and security operations teams with a fast and safe environment to create, build, and run modern applications.

*        *        *

> For the fiscal years ended December 31, 2023, 2022 and 2021, our revenue was $506.0 million, $432.7 million, and $354.3 million, respectively. We continue to invest in our business and had a net loss of $133.1 million, $190.8 million and $222.7 million for the fiscal years ended December 31, 2023, 2022 and 2021, respectively.

101.   The 2023 10-K addressed the Company's growth strategy, stating in relevant part:

**Our Growth Strategy**

Our growth strategy focuses on making our edge cloud platform accessible to a broader base of customers through enhancing our product experience, investments in technology, and vertical expansion. Key elements of our growth strategy include the following:

- *Product strategy*. Built upon a strategy of durable innovation, our programmable edge cloud platform creates a consistent and predictable pipeline of innovation. We plan to expand existing product lines like Network Services and Security, and expect to further incubate newer product lines like Compute and Observability for future growth.

  With the goal of making it easier for customers to do business with us, we will continue to build out a single, unified platform where they can access and manage all their Fastly services in one place. We will simplify customer onboarding and service usage, through easy access to self-training information from within the Fastly app, and more code samples

and support. In 2023, we simplified our pricing and packaging in order to make it easier for customers to buy and renew our services.

We launched our Next-Gen WAF in Q1 of 2022. This enables us to protect customers' applications and APIs on premise, in the cloud and on the edge. We plan to continue to invest in application security with the goal of making it easier for developers to seamlessly protect their apps and APIs wherever they are without impacting performance.

- *Expansion into additional vertical markets*. Our platform offers a broad range of capabilities. Our differentiated high performance and low-latency delivery network and edge compute platform, as well as enhanced security capabilities, allows us to serve the needs of our existing customers and continue to add customers from a diverse set of industries.

- *Expand existing customer relationships*. Over time, our customers have expanded their use of our platform. In more technically savvy organizations, developers have championed our solution, paving the way for us to engage with business decision makers. For more traditional organizations, we are often brought in to initially help facilitate a move to the cloud and from there we extend our product to support many other use cases. We plan to continually increase wallet-share over time for existing customers as we build out new products and features, and as customers continue to fully recognize the value of our platform.

- *Grow our technology partner ecosystem*. We operate between and complement the "big 3" origin cloud platforms, Amazon Web Services ("AWS"), Microsoft (Azure), and Google Cloud Platform, and a growing community of companies that provide big data, machine learning, and security solutions. In this sense, we act as the unifying layer for a growing number of cloud services. As customers consume more cloud and software as a service ("SaaS") offerings, we can create additional value and grow with these partners.

- *International expansion*. As our customer base grows, we plan to scale our network to bring edge computing closer to where our customers are. We believe significant opportunities exist for international growth.

### April 24, 2024 Proxy Statement

102.   On April 24, 2024, Fastly filed the 2024 Proxy Statement with the SEC. The 2024 Proxy Statement was solicited by Defendants Nightingale, Alvarez, Bergman, Daniels, Hornik, Loop, Meyers, Paisley, and Smith. The 2024 Proxy Statement solicited

shareholders to, *inter alia*: (1) reelect Defendants Hornik, Meyers, and Smith to the Board; (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for Fiscal Year 2024; and (3) conduct an advisory vote to approve the compensation of Fastly's named executive officers.

103.    Regarding the "Role of the Board of Directors in Risk Oversight," the 2024 Proxy Statement stated the following:

> One of the key functions of our Board of Directors is informed oversight of our risk management process. In particular, our Board of Directors is responsible for monitoring and assessing exposure from strategic risk, operational risk and technology risk, information security risk, and cybersecurity risk with periodic reporting from our most senior information security officer and other members of senior management. Our executive officers are responsible for the day-to-day management of the material risks we face. Our Board of Directors administers its oversight function directly as a whole, as well as through various standing committees of our Board of Directors that address risks inherent in their respective areas of oversight. Our Audit Committee is responsible for overseeing the management of risks associated with our financial reporting, accounting and auditing matters, investment risks and foreign exchange risks, and tax matters. Our Compensation Committee oversees the management of risks associated with talent and our compensation policies and programs; and our Nominating and Corporate Governance Committee oversees the management of risks associated with director independence, conflicts of interest, composition, organization, and evaluation of our Board of Directors, director succession planning, law and compliance, and oversight of corporate governance, including environmental, social and governance ("ESG")-related matters.

104.    Regarding the Code of Conduct, the 2024 Proxy Statement states that:

We have adopted a Code of Business Conduct and Ethics (the "Code of Conduct") applicable to all of our employees, executive officers, and directors. The Code of Conduct is available on our website at investors.fastly.com. The Nominating and Corporate Governance Committee of our Board of Directors is responsible for overseeing the Code of Conduct and must approve any waivers of the Code of Conduct for executive officers and directors. If we make any substantive amendments to the Code of Conduct or grant any waiver from a provision of the Code of Conduct to any executive officer or director, we will promptly disclose the nature of the amendment or

waiver on our website.

105.   Defendants Nightingale, Alvarez, Bergman,  Daniels, Hornik, Loop, Meyers, Paisley, and Smith caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) there was actually a significant deceleration in growth among Fastly's largest customers, making it improbable that the increased market share gained in 2023 via the consolidation trend would remain; (2) the deceleration would likely have a material negative impact on Fastly's revenue growth; (3) because of the foregoing, the Company's financial position and/or prospects were materially overstated; and (4) the Company's internal controls were inadequate. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

106.   The 2024 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

107.   As a result of Defendants Nightingale, Alvarez, Bergman, Daniels, Hornik, Loop, Meyers, Paisley, and Smith causing the 2024 Proxy Statement to be false and misleading, shareholders voted to reelect Defendants Hornik, Meyers, and Smith to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, and to appoint Deloitte & Touche LLP as the Company's independent registered public accounting firm for Fiscal Year 2024.

108.   The statements referenced in ¶¶ 95-101 above were materially false and misleading when made because they failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements

failed to disclose that (1) there was actually a significant deceleration in growth among Fastly's largest customers, making it improbable that the increased market share gained in 2023 via the consolidation trend would remain; (2) the deceleration would likely have a material negative impact on Fastly's revenue growth; (3) because of the foregoing, the Company's financial position and/or prospects were materially overstated; and (4) the Company's internal controls were inadequate. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **The Truth Emerges**

### *May 1, 2024 Press Release*

109.   The truth emerged after the market closed on May 1, 2024, when the Company issued the May 1st Press Release disclosing its financial results for the first quarter or 2024. The May 1st Press Release revealed, among other things, revised guidance for the Fiscal Year 2024. Specifically, the May 1st Press Release revealed that Fastly lowered its revenue estimates for Fiscal Year 2024 from $580 to $590 million, down to $555 to $565 million. The May 1st Press Release quoted Defendant Nightingale as stating, in relevant part:

> I am pleased with the first quarter operating performance, posting non-GAAP operating loss above our guidance and positive cash flow from operations . . . [b]ut, we're not satisfied with our revenue growth outlook.

110.   The May 1st Press Release further revealed, in relevant part:

**First Quarter 2024 Financial Summary**
- ***Total revenue of $133.5 million***, representing 14% year-over-year growth. Network services revenue of $106.0 million, representing 12% year-over-year growth. Security revenue of $24.6 million, representing 16% year-over-year growth. Network Services include solutions designed to improve performance of websites, apps, APIs, and digital media. Security includes products designed to protect websites, apps, APIs, and users.

### *May 1, 2024 Earnings Call*

111.   Also on May 1, 2024, the Company held the Q1 2024 Earnings Call to discuss

the results published in the May 1st Press Release. In explaining the flip in guidance, Defendant Nightingale revealed, in relevant part:

> Now let me turn to address our outlook going forward. Our second-quarter guidance of 6% to 9% year-over-year growth and modified 2024 annual rent of 12% year-over-year growth are not where we expected our business to perform, and of course, are disappointing.
>
> *         *         *
>
> There are a few factors that contributed to a challenging short-term environment. The biggest factor is a reduction of revenue from a small number of our largest customers. The first-quarter revenue from our top 10 customers dropped from 40% to 38%.
>
> Many of the top 10 accounts run a multi-vendor strategy. And we did see significant volatility here. And there are a few reasons for that. Firstly, historically, Fastly has gradually won greater traffic share in our largest accounts. But with the timing of rate and volume changes, we saw increased volatility this quarter. To be clear, we have not been removed from any of our largest customers and we remain in a strong strategic position, each of them long term.
>
> Secondly, in some accounts, we did see an addition of CDN vendors or reversal of the vendor consolidation we saw last year. And thirdly, we are seeing a slight uptick from the typical level of rerates with our largest customers, but we have not yet seen the commensurate traffic expansion usually associated with this motion.

112. Defendant Kisling continued with scripted remarks, revealing, in relevant part:

> [W]e are facing a challenging environment of revenue declines in our largest customers, overshadowing the impact of new customer acquisition and product pipeline. Our guidance reflects these dynamics in our business and the visibility that we have today. We expect a flattish to modest sequential decline in Q2 revenues compared to our Q1 results due to lower traffic, specifically at our largest customers. We also will not benefit in 2024 from the favorable impact of the CDN consolidation that occurred in early 2023 that drove favorable sequential growth in the prior year same period

### May 2, 2024 Bank of America Downgrades

113. The next day, on May 2, 2024, BOA downgraded Fastly's stock from a "Buy"

recommendation to an "Underperform" rating. BOA further slashed Fastly's stock price target more than half, from $18 per share to $8 per share. BOA based this decision, relying in part on, "[d]ecelerating growth in Fastly's largest customers, share loss in delivery, and limited visibility in 2H cause us to question a rebound in 2024," and continuing, "[w]hile we continue to like Fastly's positioning in the edge compute market, we see it as a 2025 opportunity instead of a near-term growth driver."

114.    On this news, the price of the Company's stock fell 32.02%, or $4.14 per share, from a closing price of $12.93 per share on May 1, 2024 to close at $8.79 per share on May 2, 2024.

## DAMAGES TO FASTLY

115.    As a direct and proximate result of the Individual Defendants' conduct, Fastly has lost and will continue to lose and expend many millions of dollars.

116.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

117.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

118.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

119.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

120.   As a direct and proximate result of the Individual Defendants' conduct, Fastly has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

121.   Plaintiff brings this action derivatively and for the benefit of Fastly to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Fastly, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Exchange Act, as well as for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Nightingale and Kisling.

122.   Fastly is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

123.   Plaintiff is, and has been at all relevant times, a shareholder of Fastly. Plaintiff will adequately and fairly represent the interests of Fastly in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

124.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

125.   A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Fastly's Board consisted of the following nine individuals: Defendants Nightingale, Alvarez, Bergman, Daniels, Hornik, Loop, Meyers, Paisley, and Smith (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the nine Director-Defendants that were on the Board at the time this action was filed.

126.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of

the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

127.   Moreover, the Director-Defendants solicited the 2024 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect Defendants Hornik, Meyers, and Smith to the Board, thus allowing them to continue breaching their fiduciary duties to Fastly.

128.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Fastly to issue materially false and misleading statements. Specifically, the Director-Defendants caused Fastly to issue false and misleading statements which were intended to make Fastly appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

129.   Additional reasons that demand on Defendant Nightingale is futile follow. Defendant Nightingale has served as the Company's CEO and as a Company director since September 2022. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer and influential member of the Board, Defendant Nightingale was ultimately responsible for the issuance of all of the false and misleading statements during the Relevant Period, including the false and misleading statements in the 2024 Proxy Statement, which he solicited, and for statements in the 2023 10-K, the Q1 2024 Earnings Call and the May 1st Press Release. In addition, Defendant Nightingale's solicitation of the 2024 Proxy Statement led to the reelection of Defendants Hornik, Meyers, and Smith to the Board, allowing them to continue breaching their fiduciary duties to the Company. The Company provides Defendant Nightingale with his principal occupation, for which he receives handsome compensation, including over $10 million for

the 2023 Fiscal Year alone. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Additionally, he engaged in lucrative insider trading, obtaining personal profits of approximately $679,501. For these reasons, Defendant Nightingale breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130.  Additional reasons that demand on Defendant Alvarez is futile follow. Defendant Alvarez has served as a Company director since August 2019. She also serves as a member of the Compensation Committee, and as the Chairperson of the Nominating and Corporate Governance Committee. Defendant Alvarez received and continues to receive handsome compensation for her role as a director, including $244,994 in the 2023 Fiscal Year. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Alvarez signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein. She also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and caused the shareholders to re-elect of Defendants Hornik, Meyers, and Smith to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, as alleged above. For these reasons too, Defendant Alvarez breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

131.  Additional reasons that demand on Defendant Bergman is futile follow.

Defendant Bergman has served as a Company director since March 2011. He also currently serves as the Chief Technology Officer, served as the former "Chief Architect" from February 2020 until April 2024, and served as the former Chairperson of the Board of Directors from February 2020 until April 2023. Thus, as the Company admits, he is not an independent director. Defendant Bergman received and continues to receive handsome compensation for his roles with the Company, including $12,389,343 in the 2023 Fiscal Year alone. As a trusted Company director and Company officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Bergman signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein. He also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and caused the shareholders to re-elect of Defendants Hornik, Meyers, and Smith to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, as alleged above. Additionally, he engaged in lucrative insider trading, obtaining personal profits of approximately $175,402. For these reasons too, Defendant Bergman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

132.    Additional reasons that demand on Defendant Daniels is futile follow. Defendant Daniels has served as a Company director since November 2021. He also serves as a member of the Audit Committee. Defendant Daniels received and continues to receive handsome compensation for his role as a director, including $239,994 in the 2023 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant

Daniels signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein. He also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and caused the shareholders to re-elect of Defendants Hornik, Meyers, and Smith to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, as alleged above. Additionally, he engaged in lucrative insider trading, obtaining personal profits of approximately $98,318. For these reasons too, Defendant Daniels breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

133. Additional reasons that demand on Defendant Hornik is futile follow. Defendant Hornik has served as a Company director since February 2013. He also serves as a member of the Compensation Committee, as a member of the Nominating and Corporate Governance Committee, and as the Chairperson of the Board. Defendant Hornik received and continues to receive handsome compensation for his role as a director, including $263,346 in the 2023 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Hornik signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein. He also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and caused the shareholders to re-elect himself, and Defendants Meyers and Smith, to the Board, thereby allowing himself and Defendants Meyers and Smith to continue to breach their fiduciary duties to the Company, as alleged above. For these reasons too, Defendant Hornik breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

134. Additional reasons that demand on Defendant Loop is futile follow.

Defendant Loop has served as a Company director since July 2021. She also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Loop received and continues to receive handsome compensation for her role as a director, including $243,744 in the 2023 Fiscal Year. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Loop signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein. She also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and caused the shareholders to re-elect of Defendants Hornik, Meyers, and Smith to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, as alleged above. For these reasons too, Defendant Loop breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

135.    Additional reasons that demand on Defendant Meyers is futile follow. Defendant Meyers has served as a Company director since July 2021. He also serves as the Chairperson of the Compensation Committee. Defendant Meyers received and continues to receive handsome compensation for his role as a director, including $242,892 in the 2023 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Meyers signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein. He also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and caused the shareholders to re-elect himself, and Defendants Hornik and Smith, to the Board, thereby allowing himself

and Defendants Hornik and Smith contributed to his re-election to the Board, allowing himself to continue to breach his fiduciary duties to the Company, as alleged above. For these reasons too, Defendant Meyers breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

136. Additional reasons that demand on Defendant Paisley is futile follow. Defendant Paisley has served as a Company director since July 2018. He also serves as a member of the Nominating and Corporate Governance Committee and as the Chairperson of the Audit Committee. Defendant Paisley received and continues to receive handsome compensation for his role as a director, including $253,744 in the 2023 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Paisley signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein. He also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and caused the shareholders to re-elect of Defendants Hornik, Meyers, and Smith to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, as alleged above. Additionally, he engaged in lucrative insider trading, obtaining personal profits of approximately $15,600. For these reasons too, Defendant Paisley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

137. Additional reasons that demand on Defendant Smith is futile follow. Defendant Smith has served as a Company director since November 2021. She also serves as a member of the Nominating and Corporate Governance Committee. Defendant Smith received and continues to receive handsome compensation for her role as a director,

including $233,744 in 2023. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Smith signed, and thus personally made, the false and misleading statements in the 2023 10-K referenced herein. She also solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions and caused the shareholders to re-elect herself, and Defendants Hornik and Meyers, to the Board, thereby allowing herself and Defendants Hornik and Meyers to continue to breach their fiduciary duties to the Company, as alleged above. For these reasons too, Defendant Smith breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

138.    Additional reasons that demand on the Board is futile follow.

139.    Defendants Paisley (as Chairperson), Daniels, and Loop served as members of the Audit Committee at all relevant times (collectively, the "Audit Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

140.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

141.    Fastly has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Fastly any part of the damages Fastly suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

142.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

143.    The acts complained of herein constitute violations of fiduciary duties owed by Fastly's officers and directors, and these acts are incapable of ratification.

144.    The Director-Defendants may also be protected against personal liability for

their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Fastly. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Fastly, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

145.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Fastly to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

146.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **<u>FIRST CLAIM</u>**
### **Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

147.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

148.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of

interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

149.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

150.    Under the direction and watch of the Individual Defendants, the 2024 Proxy Statement failed to disclose, *inter alia*: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

151.    The 2024 Proxy Statement also failed to disclose that: (1) there was actually a significant deceleration in growth among Fastly's largest customers, making it improbable that the increased market share gained in 2023 via the consolidation trend would remain; (2) the deceleration would likely have a material negative impact on Fastly's revenue growth; (3) because of the foregoing, the Company's financial position and/or prospects were materially overstated; and (4) the Company's internal controls were inadequate. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

152.    In the exercise of reasonable care, the Individual Defendants should have

known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to the reelection of Defendants Hornik, Meyers, and Smith to the Board.

153.    As a result of the material misstatements and omissions contained in the 2024 Proxy Statement, Company shareholders reelected Defendants Hornik, Meyers, and Smith to the Board, allowing them to continue breaching their fiduciary duties to Fastly.

154.    The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

155.    Plaintiff, on behalf of Fastly, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

156.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

157.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Fastly's business and affairs.

158.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

159.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Fastly.

160.    In breach of their fiduciary duties owed to Fastly, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) there

was actually a significant deceleration in growth among Fastly's largest customers, making it improbable that the increased market share gained in 2023 via the consolidation trend would remain; (2) the deceleration would likely have a material negative impact on Fastly's revenue growth; (3) because of the foregoing, the Company's financial position and/or prospects were materially overstated; and (4) the Company's internal controls were inadequate. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

161.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

162.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

163.    In yet further breach of their fiduciary duties, during the Relevant Period, five of the Individual Defendants engaged in lucrative insider sales while the stock prices were artificially inflated before the fraud was exposed, netting proceeds of approximately $1,429,139.

164.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Fastly's securities.

165.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to

fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Fastly's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

166.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

167.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Fastly has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

168.   Plaintiff, on behalf of Fastly, has no adequate remedy at law.

<u>**THIRD CLAIM**</u>
**Against Individual Defendants for Unjust Enrichment**

169.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Fastly.

171.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Fastly that was tied to the performance or artificially inflated valuation of Fastly, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

172.    Plaintiff, as a shareholder and a representative of Fastly, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

173.    Plaintiff, on behalf of Fastly, has no adequate remedy at law.

## FOURTH CLAIM
### Against Individual Defendants for Abuse of Control

174.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Fastly, for which they are legally responsible.

176.    As a direct and proximate result of the Individual Defendants' abuse of control, Fastly has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

177.    Plaintiff, on behalf of Fastly, has no adequate remedy at law.

## FIFTH CLAIM
### Against Individual Defendants for Gross Mismanagement

178.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

179.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Fastly in a manner consistent with the operations of a publicly held corporation.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

180.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Fastly has sustained and will continue to sustain significant damages.

181.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

182.   Plaintiff, on behalf of Fastly, has no adequate remedy at law.

### SIXTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

183.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

185.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Fastly to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

186.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

187.   Plaintiff, on behalf of Fastly, has no adequate remedy at law.

### SEVENTH CLAIM
### Against Defendants Nightingale and Kisling for Contribution Under Sections 10(b) and 21D of the Exchange Act

188.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189.   Fastly and Defendants Nightingale and Kisling are named as defendants in the

Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Nightingale's and Defendant Kisling's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

190.   Defendants Nightingale and Kisling, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

191.   Accordingly, Defendants Nightingale and Kisling are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

192.   As such, Fastly is entitled to receive all appropriate contribution or indemnification from Defendants Nightingale and Kisling.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Fastly, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Fastly;

(c)   Determining and awarding to Fastly the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Fastly and the Individual Defendants to take all necessary

actions to reform and improve Fastly's corporate governance and internal procedures to comply with applicable laws and to protect Fastly and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

      2. a provision to permit the shareholders of Fastly to nominate at least five candidates for election to the Board;

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

    (e)    Awarding Fastly restitution from Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

## **<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

Verified Shareholder Derivative Complaint

1    Dated: June 12, 2024                    Respectfully submitted,

2                                            **THE BROWN LAW FIRM, P.C.**

3                                            */s/ Robert C. Moest*
                                             Robert C. Moest, Of Counsel, SBN 62166
4                                            2530 Wilshire Boulevard, Second Floor
                                             Santa Monica, CA 90403
5                                            Telephone: (310) 915-6628
                                             Facsimile: (310) 915-9897
6                                            Email: RMoest@aol.com
7
8                                            **THE BROWN LAW FIRM, P.C.**
                                             Timothy Brown
9                                            767 Third Avenue, Suite 2501
                                             New York, NY 10017
10                                           Telephone: (516) 922-5427
                                             Facsimile: (516) 344-6204
11                                           Email: tbrown@thebrownlawfirm.net
12
13                                           *Counsel for Plaintiff*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Verified Shareholder Derivative Complaint